Laubie, J.
The cases of William Medill, as administrator of Christian Schneider, deceased, v. Henry Fitzgerald and wife, and the same plaintiff v.Robert Lyon and wife,are of the same character — wherein the defendants appeal and prosecute error from the same judgment.
The defendants move to dismiss the appeals, and the question presented is whether a party may appeal and prosecute error at the same time, from the same judgment; and if so, secondly, whether there was any right of appeal in the cases.
So far as the first question is concerned, it has been recently decided by the supreme court, that a party may appeal and prosecute error at the same time; and if it be determined that there was no right of appeal, then the error proceeding would stand.
Upon the question whether the cases were in fact appeal-able under the statute, we also hold against the motion. Either party had the right to appeal.
The actions upon the part of Medill were brought, as stated in his petitions, upon three several causes of action; the first two upon independent promissory notes executed by the defendants to the decedent, and the third for the purpose of foreclosing a mortgage given to secure the larger of the two notes in each case.
There was no denial in the answers of the execution and delivery of these notes and mortgages, but the defendant *417 set up, in each case, in the nature of a cross-petition, an equitable cause of action to have the notes and mortgage delivered up and cancelled, on the ground that the money which they represented, was a gift by way of advancement to Mrs. Fitzgerald and Mrs. Lyon, the daughters of the decedent.
In such a case, where by cross-petition the party [seeks equitable affirmative relief which, if granted, would extinguish the legal cause of action,either party has the right of appeal. 54 Ohio St., 348.
Appeals were properly taken in these cases, and the petitions in error may be dismissed.
The question now recurs upon the disposition of these appeal cases. An agreement is presented to us by counsel, that in case this court find the appeals properly taken and good in law, that we should consider the cases as tried before us upon the testimony contained in the bill of exceptions, the same as if the witnesses had testified before us orally.
As I have said, the only issue in either case was upon an equitable cause of action, set up and denominated an answer to the petition it is true, but which is, in fact, a cross-petition, that the money represented by the notes and mortgage sued upon, had been given to the daughter by the father Christian Schneider, the decedent, as an advancement, either in full or in part satisfaction of her share of his estate upon his decease.
The burden of proof, therefore, rested upon the defendants; and a mere preponderance of evidence is not sufficient to establish the affirmative of that issue. The evidence must oe clear and convincing that such was the agreement.
In the case against the Fitzgeralds, the two notes, one for $300 and one for $800, were payable in one year after their date, and were dated in September, 1891; and the claim is that in the spring prior thereto, the father gave *418 them::the money represented by these notes, to'|build a h'duse for themselves upon the lot in question.- -It is alsci alleged in the cross-petition, that the decedent gave this lot' to them at that time, but there is no evidence of it. The Fitzgeralds, or one of them, which one does not appear, owned the lot; nor does it appear from whom the title was derived, nor is it material to the disposition of the case.
The same is true as to the Lyons case, ■ but in that instance the house was built and the money advanced in 3894, and the notes executed December 24th, 1894,- more than three years after the Fitzgeralds’, but when the house was finished is not distinctly shown in the eivdence. In one case, the- contractor who built the Fitzgerald house, testified that Fitzgerald paid him the money, and’’! not Schneider; and in the other case, the contractor who built the1 Lyons house says that Schneider paid most of the money, and Lyon paid him some; but when the money was paid or given,or the houses finished, is not definitely shown. The daughter of Fitzgerald testified that in the spring of 1891, as she came home from school, when she was fourteen years of age, her father, mother and grandfather were upon the porch of the house they lived in, and she heard her grandfather say he would give her mother and father money to build a house, and her Aunt Menie too — that was :Mrs. Lyon — ‘and her grandfather said: “You had better take it now as any other time;’’ and she says,“They said,all right, and they took the money and built the house.’’ But if any money passed at that time, or that she saw the money, does not appear. It is a geneial statement or conclusion of hers, that they took the money and built the house.
So' there is no evidence really as to when the money was given, except that it must have been paid by Mr. Schneider, or handed over to the parties while the houses were build; ing. At all events, in each instance, after the house was’ finished, these-notes were executed for the amount that Mr;1 *419 Schneider had advanced, and a mortgage taken by. him' to secure the larger note. In each instance "there . were two notes given of the same date,- payable one year .therefrom — - one for $800 and one for $500 by the Lyons; but for some unexplained reason the decedent did not include both notes in the mortgage.'
.. Now, an advancement is a gift to take effect immediately, as- the share or part of the sh-a're of a child in the estate of the father, which the child would otherwise receive .at his death, intestate. It is a gift absolute, to take effect immediately. And therefore, it was incumbent upon these,. defendants to show that the money represented by these-pap-, ers was a gift absolute, and io take effect-at once.
Here the old gentleman took notes from each for • the amount advanced, 'signed not only by the daughters, but by their husbands, each payable a year after its date, with mortgage on each house from each couple to secure the larger part of the indebtedness represented on the face of the papers. (
On the face of things, therefore, it was not a gift, but a loan.
In what manner and to what extent did these defendants rebut this, and show that the papers did not represent the true contract; that instead of it being a loan, a debt from them payable to the old gentleman in one year, it was. an absolute gift to take effect in presentí?
The evidence offered by the defendant's themselves, taking it all just as it stands in the bills-of exceptions, instead of shewing it was an absolute gift, to take effect in presentí, shows that it was a gift to take effect at death, if at all:
The brother of the decedent testified that the old gentleman told "him that he had given this money to his daughters to build houses, and had taken notes and mortgages for it; (the only witness in the case that,ever heard the decedent speak of the notes and mortgages).
*420 Mrs. Schneider, a sister-in-law of Christian Schneider, the deceased, testifies that he said: “He gave the girls, money to build the houses, and they have to pay him interest as long as he lived. He had to live on the interest and when he is dead, it is the girls.”
William Y. Durban said the decedent told him several' times along in 1894 and 1895, after both houses had been built, that “he had helped his daughters to build their houses in order for them to have homes, that they were to pay him interest while he lived, and at his death it was to be theirs. He didn’t say he held any notes or mortgages against them, but he said, if they didn’t pay him the interest, he could sell the property; he wanted the interest to. live on while he lived, but if they didn’t pay the interest, he could sell the property. ” And upon cross-examination he says: “Q. He said, when he died he intended to give it to them. Is that it? A. Yes sir.” f
In his re-direct examination, he says: “Q Did he say he intended to give it, or that it was theirs when he died? A. He said it would be theirs when he died.” Re-cross examination. “Q. He didn’t say it was theirs then? A. No. sir, because it wouldn't be theirs as long as he was collecting interest on it. ”
Mrs. James Craig says: “Q. He said that he had given Yetta and Menie money to buy this property. Q. Did he say how much? A. I couldn’t say exactly, but it seems to me he said he gave Yetta $1100,and then he thought he ought to give Menie something, and he gave her $800, and they built their houses, Q. Did he say he had notes and mortgages against them? A. No sir. He said they had to pay him the interest on this money during his life time to keep him, and at the end of his life he expected them to keep their property. That is the conversation he had with me. It is no interest to me. Q. He didn’t say whether be had' one or two notes? A, He didn’t say he held any notes or *421 mortgages. Q. But he said they had to pay interest during his life? At his death he expected to give them the houses? A. He didn’t expect to give it; he had given it. He expected them to keep it. • He wanted interest on the money during his life time. Q. At the end of his life it was theirs? A. At the end of his life he was going ta let them have it. Q. He had given.it to them — he gave it to them. Explain that to me. A. I am telling you as he told me, He said he gave Yetta, I think, $1100; I wouldn’t be sure, and they were going to build a small house, or had a small house, and he proposed her to have a better and larger house. He gave her $1100, I think that was it. Then he wanted Henry Fitzgerald to pay him the interest on that during his life, and he was going to make him do it, and at the end of his life, the property would be theirs. Q. That is what he told you? A. Yes sir.”
Mr. Ellis says: “After Henry Fitzgerald’s house was built, him and me got into conversation in the shop. We got to talking about building and about the children. He said he allowed to give the girls his property at his death. He said he would hold a claim on it, and if they would pay him a small interest up to his death, the property would be the girls. He said he intended to give Charley — be told me the amount, but I don’t know what the amount was. Afterwards he said Charley sent again to him for money. He said John and him went in,the pottery. He didn’t say he paid any for John, but that John and him had taken stock in the pottery. Q. Did you have any talk afterwards about Mr. Lyon? A." Not that I know of. Q. He never talked about Mr. Lyon’s house? A. No sir, nothing more than he said he intended to give the girls their share of the property. Q. That was before Mr. Lyon built his house? A. Yes sir. Q. After Mr. Lyon built, you had a talk again? A. Yes sir. He said he would claim a little interest. He wouldn’t charge much interest until his death,and *422 then the property would belong to the girls. I told him at the same'time — ‘why don’t you make them a deed— I give my children a deed apiece for a house and lot, I says, why don’t you keep a little claim on it’; I says, I thought I might as well have the good of it as other people. I couldn’t get any rent for it,and everybody that live in it cheated me out of the rent,and I wanted to be clear of paying taxes for it.’ Q. What did he say to that? A. He laughed and said it was time enough when he died for the girls to get the property. He said he intended for them to have homes, and help them build their homes, and proposed for them to have them.”
. So the defendants themselves proved the declarations of the old gentleman that it was a gift not to take effect immediately, but at his death — that he intended to give them the money at his death, which was consistent with the fact that he had taken notes and mortgages for the amounts.
That he failed to carry out his intention can not now be helped. It is possible, ignorant man as he was — And these parties all seem to be ignorant — he may have believed that because he did not record the mortgage it would not be good, and would be worthless at his death.
It appears from the evidence of Mr. Fitzgerald and Mr. Lyon that after the death of the decedent they approached Medill, the administrator, about these notes and mortgages, and asked him if they could be collected; that Medill told them, yes, that he was going to try to collect them; they must make some payment; that he put the mortgages on record as soon as he discovered them, and he was going to foreclose them if .they did not make some ■ arrangements about it.
What was their answer about it at the time, from their own testimony? Why, they said we never expected to pay; or to have to pay these notes; the old gentleman gave the money to our wives, and he said he would' not record the *423 mortgage, and the mortgage is no good. They made no claim whatever that this money was given to the wives as their share, in whole or in part, of the amount they would receive at the death of the father out of his estate. Ignorant people as they are, they would know about such gifts, although they might not know the technical name thereof, and yet, they then made no claim that these were gifts of that character.
W. L. Medill, for Plaintiff, (in both cases).
Erskine & Erskine, and Rogers & MeOauslen, for Defendants.
This is consistent with the statement of Mr, Conway, another witness on the part of the defendants,who testified: “Mr. Schneider and Í were particular friends. I used to go over there often. I lived fight across the street from him. He was telling me who owed him,and he told me Mr. Lyon owed him $800 and Mr. Fitzgerald $700. He told me they hadn’t been paying, interest. That is what he told me. ’’
The witness was mistaken as to the amounts, but the defendants themselves were showing that the decedent referred to the monies secured by the mortgages.
It is far, therefore, from being made clear that this was a gift by way of advancement; and it is equally clear that it was not a gift inter vivos. The same testimony that shows it was not an adavncement, shows it was not a gift inter vivos. To be such it must be clear that there was a gift and delivery of the mone^ to take effect at once. Nor would it be a gift eausa mortis, because obligations were taken for the money, and were held by the decedent until his death.
We are compelled to come to this conclusion. We have examined this case thoroughly, and would be pleased if we could save to these poor people their homes, because we are convinced the decedent intended to give them this money, but ignorantly failed to legally carry out that intent, but unfortunately we are unable tc do it.
Judgment must be taken for the plaintiff in each case.